Filed 7/30/14  P. v. Keen CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058506 |
| v. | (Super.Ct.No. SWF1203081) |
| BRANDON SCOTT KEEN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jerry E. Johnson, Judge. (Retired judge of the L.A. Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part with directions.

Steven A. Torres, Torres & Torres, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant, Brandon Keen, of mayhem (Pen. Code, § 203)[1] and assault with a deadly weapon (§ 245, subd. (a)(1)). In bifurcated proceedings, defendant admitted having suffered five prior convictions for which he served prison terms (§ 667.5, subd. (b)), a serious prior conviction (§ 667, subd. (a)), and a strike prior (§ 667, subds. (c) & (e)(1)). He was sentenced to prison for 26 years and appeals, claiming evidence should not have been admitted, the jury was misdirected and sentencing error occurred. We agree with defendant that sentencing error occurred, but reject his remaining contentions. We direct the trial court to strike the one year enhancement for one of his prison priors and to stay, pursuant to section 654, his sentence for assault with a deadly weapon. We otherwise affirm.

## FACTS

Defendant was a trustee jail inmate, housed on the bottom tier, on July 11, 2012 and the victim was an inmate housed on the top tier. As a trustee, defendant wore a white t-shirt on July 11, while all the non-trustee inmates wore orange tops. Defendant's duties as a trustee included preparing lunches for the inmates housed on the top tier, then, after they had returned to their cells following lunch, preparing lunches for the inmates on the bottom tier. After lunch, the top tier inmates began returning to their cells and defendant, wearing his white t-shirt, ascended the staircase up to the top tier with a group of 8-10 top tier inmates, which was unusual because trustees are not supposed to go up and down the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

stairs at mealtimes and defendant was supposed to be downstairs preparing the lunches for the bottom tier inmates.  The former codefendant was amongst those 8-10 top tier inmates.  Both correctional officers who were guarding the area looked away for about 45 seconds, and when they looked back, one saw the group of inmates scampering around on the top tier and the victim beginning to walk down the stair case the group had just ascended.  The other correctional officer saw the victim hold his face and yell, "Help me" several times as he descended the stairs.  There was blood on the victim's face and top. He had been slashed several times in the face and ears.  At that point, the former codefendant ran to his top tier cell, as did other inmates, and defendant, who was just past the victim's cell, moved hurriedly across the tier to the opposite staircase and down that staircase.  Defendant was wearing an orange top and his white t-shirt had disappeared and was never recovered.  The former codefendant's hair was matted on one side and his top had been stretched.  Defendant went to the front of his lower tier cell, but because his cell-mate had already closed the door to their cell, it had been locked by correctional officers and defendant was unable to enter it.  Defendant began bouncing around, pumping his arms and fists up and down and moving his lips.  Other inmates appeared to cheer him on.  A call went out for other deputies to assist and when they arrived, the slider door opened after the victim said, "They're trying to kill me" or "Open the door or they will get me" and the victim, who had been standing there, went out the door escorted by a correctional officer.  Defendant walked up to the deputies who were near the slider and asked, "What's up?"  Defendant was told to turn around and put his arms behind him,

3

and he replied, "'Fuck you.'" Deputies told defendant to come closer to them and when he did, he dropped down on both knees and put his hands on the ground, into the blood that had dripped onto the floor from the victim's wounds, even though he had not been told to do so. Defendant was told to get back up but he did not. Two deputies grabbed defendant's hands and as they began to cuff him, he went limp and fell onto his stomach on the ground, again into the drops of blood that had been left by the victim. Defendant had to be drug out of the area by the deputies. As defendant passed the victim, the latter said, "That's the piece of shit that did this to me." In front of the victim's top tier cell, someone had tried to wipe blood up off the floor with a towel. While the deputies were examining the blood deposited on the top tier, the former codefendant was in his cell trying to get something out of his sock with a towel. The former codefendant was told to stop doing this, but he continued to rub the sock. He had laid out an orange top and orange pants on his bunk and they had wet spots. The victim's cellmate wiped blood up off the floor in their cell. The weapon used to slash the victim's face was never found. Inmates were known to flush towels, t-shirts and weapons down their toilets. The victim identified five others who were involved in the attack, including the former codefendant. The victim told correctional officers that a razor had been used to slash his face. He also said that the attack occurred because he had been shot in the neck in December 2011 and he told the police in 2012 what had happened and who had done it. The victim refused to testify at trial. A Hemet police officer testified that the victim reported to him in December 2011, that he had been shot in the neck and the officer saw the victim's

4

wound. Another Hemet police officer testified that in April 2012, the victim had discussed the December 2011 shooting with him and two weeks later the officer talked to the person the victim had identified as the shooter and the officer told this person that the victim had identified him as the shooter.

## ISSUES AND DISCUSSION

1. *Admission of Evidence*

Before the two Hemet police officers testified, defense counsel objected to them testifying that the victim had told one of them who had shot the victim in 2011, as it was hearsay, and the victim's state of mind was not in issue. The prosecutor responded that it wasn't the fact that the victim identified his shooter, but the fact that the victim spoke to law enforcement, which, in the jail culture, converted the victim into a snitch and provided the motive for the stabbing. Therefore, the statement was not being offered for the truth of the matter asserted therein, i.e., that a certain person shot the victim, or even that the victim had, indeed, been shot, but for the fact that the victim talked to the police about it. The prosecutor added that he would not have the officer to whom the victim made the statement identifying his shooter testify who the victim said had shot him.[2] The trial court ruled that the evidence was admissible to prove a motive for the stabbing.

---

[2] The prosecutor said this before defense counsel also objected to the officer testifying whom the victim identified as his shooter.

At trial, one Hemet officer testified that on December 29, 2011, the victim reported that he had been assaulted. The victim had a laceration on the right side of his neck and a bruise on his right shoulder. When asked how the laceration occurred, the victim said that he thought he had been shot. The laceration was actually a gunshot wound. Another Hemet officer testified that on April 7, 2012, the victim was in custody when he and the victim discussed the December 2011 shooting. Two weeks later, the officer talked to a person who was in custody at the time on an unrelated matter and that person turned out to be the person whom the victim had identified as the shooter. The officer told this person that the victim had identified this person as the shooter.

Defendant here confuses the discussion over defense counsel's objection to the testimony of the Hemet police officers with the subsequent testimony of the correctional officers that after defendant was attacked, he told the correctional officer that the reason he was slashed was because he had been shot in the neck in December 2011 and in 2012, he told the police what had happened.[3] Defense counsel did not object to this, but when

---

[3] We reproduce the exchange between the trial court, defense counsel and the prosecutor to demonstrate to appellate counsel for defendant that the objection to which appellate counsel refers in his opening brief was made to the testimony of the two Hemet police officers and not to the testimony of the correctional officer, thusly,

"[DEFENSE COUNSEL]: It was my understanding that two of the witnesses the People have, I don't know if they're the ones that [the prosecutor] is anticipating this afternoon, two witnesses from Hemet P.D.
"[THE PROSECUTOR]: One is from Hemet P.D.
"[DEFENSE COUNSEL]: The officer from Hemet P.D., it's my understanding that this is an officer who on April 7th, 2012, [the victim] . . . [¶] . . . [¶] told . . . who supposedly shot [the victim] and made statements about the surrounding circumstances. *I*

*[footnote continued on next page]*

6

*[footnote continued from previous page]*

*would object to that.* That seems like the only reason that would be being admitted is for the truth of the matter asserted which would be hearsay. And I don't know how [the victim]'s state of mind as it relates to that is at issue.

"[THE PROSECUTOR]: It's . . . for motive . . . it's not the fact that [the victim] was shot that's important, it's the fact that [the victim] told the police he was shot which is how in jail terms you get labeled a snitch. And so the fact that he told the police is what's relevant, not what he told the police. . . . [I]t is what [the victim] said that made him a snitch.

"[DEFENSE COUNSEL]: And I don't think motive is an exception to the hearsay rule.

"[TRIAL COURT]: I haven't heard that it's an exception.

"[THE PROSECUTOR]: But it's not offered for the truth, it's offered for the fact that he said these things to the police. It doesn't matter whether he was actually shot or whether it was Guy Davis [(the victim told only one of the Hemet officers that it was Guy Davis who shot him)] who shot him, it's the fact that [the victim] told the police that [Guy Davis] did it that's important. So it's not offered for the truth of the matter. It's not hearsay. [¶] . . . [¶] [It]'s to establish the motive for being slashed . . . because snitches in custody are subject to reprisals such as this. And the fact that he told the police, that is what's important, not what he told the police.

"[TRIAL COURT]: . . . Based on that argument, . . . *Officer Paez* [(one of the Hemet officers)] *can testify that* [*the victim*] *told him he had supplied information to law enforcement.*"

"[THE PROSECUTOR]: Paez . . . will testify that he saw the victim . . . with the gunshot wound and . . . sometime in days afterwards, [the victim] said [the shooter] was Guy Davis."

Defense counsel then summarized the anticipated testimony of the two Hemet police officers, followed by,

"[THE PROSECUTOR]: . . . [A]ll I want [the Hemet officer to testify to is,] . . . [']Were you at the station? . . . Did you see the gunshot wound? . . . [A]nd did [the victim] . . . later identify—I'm not even going to say Guy Davis—identify an individual, not the defendant, who shot him to a law enforcement officer?[']  That's all I need.

"[TRIAL COURT]: That, I think, is appropriate to lay the groundwork for motive."

A discussion followed concerning Officer Paez's anticipated testimony, during which the prosecutor revealed that Officer Paez saw the victim's bullet wound in

*[footnote continued on next page]*

the officer was asked to use his report to refresh his recollection about exactly what the victim had told him, defense counsel objected on the basis of speculation. He also said, "This is outside the scope of the exception," but he did not clarify what he meant by this. The trial court then said, "[W]e talked about this at length prior to this witness . . . taking the stand. I thought I explained the ruling quite clear[ly]." The trial court then invited the prosecutor to rephrase his question to the correctional officer "so it falls within the Court's ruling." Thereafter, the correctional officer confirmed that he had already testified that the victim told him that the victim had been shot sometime in 2011 and the victim told the police who had shot him and he added that he had been shot in the month of December of 2011. Defendant now asserts that the statement by the victim to the

---

*[footnote continued from previous page]*
December, but another witness was "going to testify to the statements made by the victim" in April. Then followed,

"[THE PROSECUTOR]: I was going to talk to defense counsel about [the witness who is going to testify to the statements made by the victim in April]. *That officer is not available until tomorrow morning.* . . . [A]ll I need is the fact that [the victim] later identified the individual, [who shot him, who is] not the defendant, to law enforcement.

"[TRIAL COURT]: I think that offer of proof . . . *it's admissible.*"

The parties then discussed to what the two Hemet officers would testify, with defense counsel confirming, "[T]he victim identified to [the second Hemet officer] who supposedly [shot him]."

The prosecutor then announced that he had another witness for that day, which was the correctional officer who testified to what the victim told him following the slashing. Defense counsel said nothing about this officer's testimony at that point.

The trial court then said, referring to the prior discussion concerning the testimony of the two Hemet police officers, " . . . I think that's admissible if that's the way it comes out."

correctional officer, while non-hearsay, should not have been admitted because there was no proof that the victim had personal knowledge of the facts underlying the statement.[4] Even if we assumed that the parties below acted as though defendant's hearsay objection to the testimony of the Hemet police officers also applied to the testimony of the correctional officer, still, defendant did not object to the correctional officer's testimony on the basis that the victim lacked personal information as to why defendant slashed him. Therefore, this objection on this basis was waived. (Evid. Code, § 353; *People v. Seijas* (2005) 36 Cal.4th 291, 302.) The same is true for defendant's current assertion that the testimony was improper opinion.

As to defendant's contention that this testimony was speculative, which actually was a basis he advanced below, we point out that by the time defense counsel made this objection, the correctional officer had already testified, without objection, that the victim had said that he had been slashed because he had been shot in the neck in 2011 and he had told the police in 2012 what had happened. Defendant would have gained nothing by having the trial court rule in his favor and exclude the correctional officer's testimony

---

[4] Although defendant begins his analysis by clearly referring to the victim's statement to the correctional officer that he was slashed because of what he had told the police about being shot, appellate counsel for defendant then muddies the water later in his analysis by saying, "According to the testimony, [the victim] had told police that someone shot him [citing the correctional officer's testimony]. That person was subsequently informed that [the victim] told police his name [citing the second Hemet officer's testimony]. This is the extent of the testimony."

9

confirming his unobjected-to testimony and adding that the shooting had occurred in December.[5]

Defendant then takes the fall-back position that his attorney's failure to object to the correctional officer's testimony below on the bases he now advances constituted incompetency requiring reversal of his convictions. He can carry his heavy burden in this regard only if there is a reasonable probability that had he objected on those bases at trial, he would have enjoyed a different outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 697, 698.) First, we are not persuaded that even if defense counsel below had objected to this evidence on the bases that it was not based on personal knowledge or that it was speculative, that he would have succeeded in having it excluded. The fact is that unless the defendant made a statement as to why he slashed the victim, *no one*, including the victim, could possibly have personal knowledge of the defendant's motive or that the victim's statement was not speculative. This is where circumstantial evidence comes into play—in this case, the testimony of the two Hemet officers that the victim had been shot

_____

[5] Before trial, defense counsel mentioned a recorded interview of the victim by police on July 17, 2012, during which the victim stated his belief that he had been slashed because of events following the shooting and because he had beaten up a young person in the Banning jail. Counsel said he should be able to cross-examine the victim about the latter. During argument about this, defense counsel asserted that the notion that he was slashed because of events following the shooting was speculation. The trial court differentiated between the two motives because the People had evidence, aside from the victim's statement, that the victim had been shot and he had discussed the shooting with police, while there was no evidence as to the other motive, and the court ruled that defense counsel could not elicit from the victim the latter. Thereafter, the victim refused to testify and the point became moot.

and that he discussed the shooting with the police, including who shot him. While we might agree with defendant that the victim stating his belief that he was slashed because he did these things was opinion and even speculative, therefore, subject to exclusion, the testimony of the Hemet officers were not. That testimony, along with the testimony of another correctional officer that snitches in jail are viewed by the general jail population as worthy of getting attacked and punished for what they've done created the basis upon which the jury could reasonably conclude that this was the motive for the slashing.[6] This, along with strong evidence that defendant was the slasher, as stated above, convinces us that had defendant successfully excluded the victim's statement as to why he was slashed, there is no reasonable probability that defendant would have enjoyed a better outcome.

Defendant's concern that even if he knew the victim was a snitch, it would not give him any more motive to attack the victim than it would any other inmate who had the same knowledge, is meritless. A correctional officer testified, *under examination by the defense*, that the victim identified five other inmates, aside from defendant, as being involved in the slashing. One of those was the former codefendant, an inmate that other

---

[6] Defendant asserts that the trial court should have excluded this evidence, and he mistakenly states that it followed either the ruling on the admissibility of the Hemet officers' testimony or their testimony, which it did not. However, he failed to object to it below on any basis. It was not until this witness further testified that it did not matter whether what a snitch tells the police was true or not, that defense counsel objected, and the trial court sustained his objection on the basis of foundation. However, his initial testimony remained.

witnesses testified behaved in a manner consist with being involved,[7] as did his cell mate. Additionally, the victim reported, in reference to the attack, that "*they*" were trying to kill him. Therefore, defendant's current concern that there was no evidence that he, in particular, had knowledge of the victim snitching, can be laid to rest. If the victim being a snitch was the motive for the slashing, apparently, quite a few of his fellow inmates were aware that he was a snitch.

2. *Jury Instruction*

Defendant contends that the trial court had a sua sponte duty to give a limiting instruction to the jury about his statement to the correctional officer. Specifically, he contends that the jury should have been instructed that unless it found that the victim had personal knowledge that he had been slashed because he discussed the shooting with police, the jury was to disregard the statement. However, there is no sua sponte duty to give limiting instructions or to give additional or clarifying instructions where the instructions given are deemed by defendant to be incomplete or require elaboration. (*People v. Riccardi* (2012) 54 Cal.4th 758, 824; *People v. Hart* (1999) 20 Cal.4th 546, 622.) Moreover, any reasonable juror would know that the victim could not possibly have personally known what defendant's motive was in assaulting him, absent a statement by defendant that the victim heard, which statement surely would have been

---

[7] The former codefendant was charged with defendant for these crimes. According to defendant's probation report, the former codefendant pled guilty to assault with a deadly weapon and was sentenced to prison.

introduced into evidence if it had been made. Therefore, the jurors would have naturally viewed the victim's statement with a certain skepticism—knowing that he had no way to know for sure that it was true and that it was just his opinion. Additionally, it was stipulated that the victim had suffered three felony convictions and the jury was instructed that it may consider that in evaluating the credibility of the hearsay declarant's statement. The jury was also given the standard instruction on lay opinion. Under the circumstance, the failure to give the instruction was not error and the failure of defense counsel to request it did not constitute incompetency resulting in prejudice and requiring reversal of defendant's convictions.

3. *Sentencing*

a. *One of the Section 667.5, subdivision (b) Enhancements*

The sentencing court imposed a one year term each for defendant's prior conviction of arson in 2008 and four other prior convictions for which he served prison sentences under section 667.5, subdivision (b) and a five year term under section 667, subdivision (a) for the 2008 arson, which was a serious offense. The parties agree that under *People v. Jones* (1993) 5 Cal.4th 1142, only the serious prior enhancement may be imposed. Therefore, we will order the one year enhancement for the arson prior stricken.

b. *Section 654*

Asserting that the mayhem and the assault "occurred without any indivisible intent" the probation report recommended that the term for the latter be stayed pursuant to section 654, and defense counsel, at the sentencing hearing, requested the sentencing

13

court to follow this recommendation. The People did not address this issue and the sentencing court ran the term for the assault concurrent with the term for the mayhem. Defendant here contends that the term should have been stayed pursuant to section 654. The trial court's implied finding that defendant entertained multiple or simultaneous objectives, which were independent of and not merely incidental to each other, will be upheld on appeal if supported by substantial evidence. (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626, 627; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 267-268.)

The People argue that there were two intents and objectives as indicated by facts disclosed in the probation report which stated that defendant, the former codefendant, the victim's cellmate and three other inmates stood in the doorway of the victim's cell as he sat facing the opposite direction. The former codefendant initiated the attack by punching and kicking the victim. As the attack continued, defendant slashed the victim's face with a razor blade which had been attached to a plastic spoon.[8] During the attack,

---

[8] The People cite a case holding that continuing to inflict harm on a victim after he has been so incapacitated as to be unable to resist is consistent only with an intent to inflict extreme pain and negates any possibility that the acts occurred in an explosion of violence where the sufficiency of the evidence of intent to inflict extreme pain is challenged. (*People v. Crittenden* (1994) 9 Cal.4th 83, 141.) Based on this, the People assert that defendant had the additional intent of inflicting extreme pain based on "[the] actions [of defendant and his accomplices] in continuing to beat and slash [the victim] for almost a minute as he crawled and stumbled away, bleeding profusely, and unable to fight back . . . ." However, the only detailed report of the actual assault was contained in the probation report, which stated, "[The codefendant] initiated the attack by punching and kicking [the victim]. As the attack continued, [the victim] was slashed by [defendant] who had used a razor blade attached to the end of a plastic spoon. [The victim] was able to fight his way through his attackers [and] exited the cell . . . ." The record does not support the People's claim that the victim was incapacitated by the attack

*[footnote continued on next page]*

the victim's attackers yelled "snitch" and "rat" and someone indicated that this was the act of a Hemet area white supremacist gang. The probation report credited defendant with "leadership in the commission of the attack, including planning and co-ordination[.]"

The People assert that defendant's first intent was to attack and injure the victim "in the immediate sense" and his other was to "permanently disfigure [defendant,] marking him as a snitch." Had defendant been convicted of assault or assault by means of force likely to produce great bodily injury, there might have been a basis to divide the attack between the initial punching and kicking of the victim and the subsequent slashing of his face. However, defendant was convicted of assault *with a deadly weapon*, and the only deadly weapon at play was the razor attached to the spoon, and the People so argued to the jury. Therefore, the intent and objective of the assault was the same as the intent and objective of mayhem, i.e., to do harm to the victim.

## DISPOSITION

The trial court is directed to stay the term for the assault pursuant to section 654 and to strike the one year term imposed pursuant to section 667.5, subdivision (b) for the

_____

*[footnote continued from previous page]*
(after all, he walked out of his cell, to the staircase, down the staircase and to the dayroom slider, where he stood waiting until other deputies arrived and the door could be opened, then he walked through it, and has no support in the probation report or in the testimony at trial. For the same reason, the People's reliance on *People v. Nguyen* (1988) 204 Cal.App.3d 181, holding that gratuitous violence against a helpless and unresisting victim has been viewed as not incidental to a robbery for purposes of section 654, is misplaced.

15

arson prior, bringing the total term to 25 years, and to reflect these changes in the minutes of the sentencing hearing and the abstract of judgment.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

RICHLI

J.

MILLER

J.

16